THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL COLEMAN, JR., Defendant-Appellant.

Fifth District    No. 5—96—0099

Opinion filed November 20, 1998.

Daniel M. Kirwan and Janet Gandy Fowler, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

William Haine, State's Attorney, of Edwardsville (Norbert J. Goetten, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

This case examines what happens when counsel is blind to his duty of undivided loyalty and insists upon representing several people with interests that unmistakably conflict. It underscores why the representation of people whose interests are at odds is a decidedly bad practice that lawyers should try to avoid.

After a jury trial, defendant was found guilty on five separate counts of first-degree murder. He now serves life imprisonment. His appeal raises the issue of the conflicts of interest his lawyer labored under during that trial.

The conflicts were apparent before trial began. The State sought counsel's disqualification and removal because of them. Prosecutors argued that counsel could not effectively champion defendant's interests because he represented the interests of three prosecution

witnesses. Their arguments predicted that counsel's conflicting representations would taint his performance and necessitate another trial. Today, those concerns prove prophetic as counsel's contemporaneous representation of witnesses for the prosecution dictates a new trial. We reverse and remand.

Thomas Hildebrand was defendant's lawyer, a role that carried a duty to advance defendant's interests with unwavering allegiance. His professional undertaking required the confrontation of Robert Lockett, Michael Lockett, and Travon Watt, witnesses for the prosecution. Each of these witnesses faced future uncertain punishment for previously adjudicated guilt on unrelated cases, and each hoped to gain the State's favor in return for testimony.

These three witnesses shared something else in common. Each had hired Hildebrand to advance their interests on the very cases that awaited sentencing and provided impetus for their testimony against defendant.

This uncommon circumstance was addressed by the State's motion to disqualify. At the hearing on the motion, the State argued that Hildebrand's conflicts were "glaring." He responded:

"MR. HILDEBRAND: Well, number one, since it's glaring I am amazed that the State waits until this date to tell me about it.

Number two, I don't represent Robert Lockett. I did represent him at one time. I sure as heck don't represent him now ***.

Number three, Michael Lockett *** is being sentenced this afternoon. That doesn't have anything to do with Michael Coleman. I am unaware of anything.

Travon Watt pled guilty already and if I do recall he has already been sentenced *** [and] that's got nothing to do with this case. Those cases are done."[1]

Hildebrand's protestations notwithstanding, his conflicts were

---

[1]These responses embrace several misconceptions. It is not the State's role to monitor and timely inform Hildebrand of his conflicts. It is Hildebrand's responsibility to keep loyalties straight and representations sound. However, when the State raised the issue of Hildebrand's conflicts, he appears oblivious to the dilemma those conflicts create.

When Michael Lockett, awaiting sentencing, became a prosecution witness, Hildebrand's loyalties were compromised. His representation of Lockett was at odds with his representation of defendant. Hildebrand's notion that Lockett had nothing to do with defendant overlooks his duty to procure Lockett the most lenient sentence possible. That duty requires action before sentencing. After sentencing, Lockett can no longer leverage testimony against defendant for concessions.

Simply put, Hildebrand's allegiance to Lockett called for pursuit of a

clearly disabling. But rather than remove Hildebrand, the judge turned to defendant and asked if he perceived any problem:

> "THE COURT: Mr. Coleman, \*\*\* your attorney has got a conflict of interest here because he has been representing some of these people who are going to testify or may testify in this trial, those being Robert Lockett, Michael Lockett, and Travon Watt. Do you have any problem with that? \*\*\*
>
> DEFENDANT COLEMAN: No sir. *As long as nobody harm [sic] me.*
>
> THE COURT: Pardon, sir?
>
> DEFENDANT: No, sir." (Emphasis added.)

The judge accepted this and Hildebrand remained on the case.

On the eve of trial, Hildebrand's conflicts were revisited. When the State asked the judge to reconfirm defendant's willingness to waive Hildebrand's conflicts, the judge turned to Hildebrand:

> "THE COURT: All right. Has your client been afforded a list of witnesses?
>
> MR. HILDEBRAND: Yes, your Honor. We have gone over the witness list several times.
>
> THE COURT: Does your client understand the problem with the fact that you have in the past and presently represent some of these witnesses?"

Hildebrand, rather than responding to the judge's question, stated:

> "MR. HILDEBRAND: Only person \*\*\* who I am still listed as attorney of record for is Michael Lockett \*\*\*. If that's going to be a problem, if the Court will grant me leave to withdraw \*\*\* someone else can handle the sentencing. \*\*\* Everyone else is a *prior client* of mine.
>
> Mr. Coleman is aware of that. We have discussed all these people \*\*\* .
>
> THE COURT: Do you understand the problem here and possible conflict your attorney has and [sic] as he just put it on the record, just laid it on the table[?] Do you understand that possible problem?
>
> DEFENDANT COLEMAN: Yes, sir.

---

course that would help to seal defendant's fate. His allegiance to defendant ran counter to such a course. He could not ethically choose between these competing interests, much less continue to represent them.

. In addition, none of the witnesses' cases were completed. Contrary to Hildebrand's claim, the cases of Michael Lockett, Robert Lockett, and Travon Watt were still ongoing. The Locketts still faced sentencing and hoped to minimize punishment by aiding the prosecution in pursuit of defendant's conviction. Travon Watt faced a sentencing on a burglary plea and a trial on a pending retail theft charge. Hildebrand owed a duty of loyalty and confidentiality to all of them.

THE COURT: Are you willing to waive any problem or use the big words 'conflict of interest?' Do you want to do that?

DEFENDANT COLEMAN: Yes, sir." (Emphasis added.)

The judge accepted this and Hildebrand remained on the case. Hildebrand entered trial with his obligation to champion Michael Lockett's interests intact. Everyone, including defendant, accepted Hildebrand's view that his duty of undivided loyalty allowed the representation of Lockett, provided Lockett's interests were abandoned prior to his testimony. And Travon Watt was declared by implication to be a past client.

Travon Watt testified. His testimony refuted defendant's claim that he did not know his codefendant Williams. Watt testified that defendant and Williams were fellow gang members who routinely rode in a green minivan, the type of vehicle seen leaving the murder scene. Watt acknowledged prior convictions for "drugs and weapons and burglary." He was then asked:

"Q. And any other charges?

A. Burglary charge.

Q. And is that pending?

A. Yes, sir.

Q. And have you received any offers in return for your testimony regarding that burglary charge?

A. No, sir."

Hildebrand represented Watt on the pending burglary. He also represented Watt on a pending retail theft charge. Watt failed to disclose the pending theft, implying that a burglary charge was all that jeopardized his freedom. Watt was not asked about his interest in the pending theft. There was no inquiry into his motives for testifying. There was no effort at impeachment.

In April of 1995, Watt and Hildebrand appeared for Watt's sentencing. Watt, a convicted felon several times over, received three-year concurrent prison terms for the 1993 burglary, the 1994 retail theft committed while on bond, and a 1995 burglary (charged after his testimony). The State sought a four-year prison term when Watt entered his burglary plea in 1993. Watt remained on bond after the plea, committed additional crimes, testified against defendant, and received less punishment for three crimes than he faced when the original burglary plea was entered.

Robert Lockett testified. A formal agreement in return for his testimony allowed him to remain free on bail pending sentencing and promised a six-year prison sentence for home invasion.

Robert Lockett told the jury that he, his brother Michael, and defendant were cohorts in crime. One of the crimes they had planned to

commit was an armed robbery of the same victims that were robbed and killed in this case. It was a plan frustrated by Michael Lockett's arrest for an unrelated crime before the robbery could take place.

Robert Lockett testified that in Michael's presence defendant confessed to the murders. He related how the jailhouse confession came to pass:

"A. Mr. Hildebrand was representing me at the time. He pulled all of his clients out for a conference.

Q. Let me get this straight now. Who was your lawyer at that time?

A. Mr. Hildebrand.

Q. Okay. And he pulls all of his clients out of the jail at one time?

A. Yes.

Q. And puts you in a big conference room?

A. Correct."

According to Robert Lockett, defendant confessed while Robert, his brother Michael, and defendant waited to see Hildebrand.

Hildebrand cross-examined:

"Q. As soon as you had this alleged conversation with Mr. Coleman[,] how soon after that did you decide that you wanted to be a good citizen?

A. After you came and told me they wasn't [sic] going to accept my plea for six years and wanted to give me 15."

Hildebrand turned to what the State promised, and Robert Lockett explained:

"A. They told me that my offense did not carry [a] probation sentence so therefore the only lenience they can [sic] give me was six years and at that time I decided, okay, that's better than 15.

Q. Or 30?

A. No. You told me 15 is what they wanted to give me as a cop out. That's what you told me.

Q. But you could get?

A. But you told me as my attorney that I was looking at 15 years as a cop out.

Q. That's right. That's right.

A. Okay. So not 30, 15."

Hildebrand shifted to charges the State dismissed:

"Q. Well, how about the fact that in return for your plea of guilty the State dismissed *** charges against you for Attempt Murder *** and Aggravated Battery with a Firearm?

A. Well, you told me they didn't have me on those.

Q. Excuse me?

A. You told me they didn't have me on those.

Q. Sir, I was not your attorney when you did this plea. This was a deal that you had with the State's Attorney.

A. Mr. Hildebrand, you initially pleaded for me.

Q. Mr. Lockett, you plead [sic] guilty on April 21st and I wasn't your attorney at that time, was I?

A. When did you come to get the deal for me?

Q. Sir, my question is[,] you plead [sic] guilty on April 21st, 1994, right?

A. Whatever day is stamped."

Hildebrand did not testify. Thus, it appeared that Hildebrand tried to broker a deal for Robert Lockett to testify against defendant and that Hildebrand's attempts to discredit testimony because of the deal were insincere.

The final Hildebrand client to testify for the prosecution was Michael Lockett. Hildebrand withdrew as Michael Lockett's attorney moments before Michael Lockett testified. Lockett testified under a unique arrangement. His future sentence was open. He and the State were free to seek any sentence within the sentencing range. After sentence was imposed, the State would pursue a 10-year reduction. This somewhat illusory concession was obtained while Hildebrand was Michael Lockett's attorney, but without Hildebrand's help.

Michael Lockett duplicated his brother's testimony. At the prosecutor's request, he told the jury that Hildebrand was his lawyer at the time defendant confessed to him.

Hildebrand cross-examined. Michael Lockett, like his brother before him, exploited Hildebrand's representation. The jury saw and heard the following:

"Q. Now, why did you wait until May 20th to contact the Madison County Sheriff's office *** regarding this case?

A. Because I would have did [sic] it sooner but you told me I was going to walk on my charges. ***

Q. At this point you are telling because in effect they have got you jammed up and you are waiting possible—

A. I am telling for two reasons. One, you lied to me; two, Mr. Coleman did in fact say it; and, three, it helps me out, yes, because I am telling the truth.

Q. It helps you out because you expect that you are going to get—I am not going to get in a discussion about what I supposedly lied to you about. It's not worth it.

MR. JENSEN: I object to Mr. Hildebrand's commentary. If he has a question he may ask it.

THE COURT: Mr. Hildebrand, confine your remarks to questions, not to editorializing.

MR. HILDEBRAND: Very well, your Honor. I am not the person sitting here with pending Home Invasion charges.

MR. JENSEN: Your Honor—

THE COURT: Mr. Hildebrand, that is highly improper.

A. Hey, man. You been [*sic*] lying from day one. What's the fuck wrong with you?

THE COURT: Mr. Hildebrand, that's highly improper. You have been admonished."

On redirect, inquiry explored Hildebrand's conflicting representation:

"Q. Now, when you indicated that Mr. Hildebrand lied to you[,] what do you mean?

A. I mean, man, you have to be there to see it.

MR. HILDEBRAND: I am going to object to this particular line of inquiry. If you want to get into—

THE COURT: If it was brought out on cross-examination *** is that your objection?

MR. HILDEBRAND: My objection is that this is probably something we better discuss out of the presence of the jury.

THE COURT: Make a record later.

***

Q. What do you mean he lied to you?

A. I was supposed to walk on these charges pending on me.

Q. Did he represent you in the trial?

A. Yes, he did. Did he call any of my witnesses? No he didn't.

Q. What kind of witnesses did you have?

A. I had two witnesses.

Q. Alibi witnesses?

A. Yes.

Q. He did not call them?

A. No.

Q. At that point in time was he still representing you?

A. Yes, he was.

Q. When did he withdraw?

A. Today.

***

Q. At the time that Mr. Hildebrand was representing you in that trial did he know that your brother was going to testify against his other client?

A. Yes, he did.

MR. HILDEBRAND: Objection, your Honor. How could he possibly know that especially when I didn't know it and didn't represent him[?]

A. Yes, you did, man. You knew because he told you in the attorney's booth that day.

MR. HILDEBRAND: I withdrew in that case quite sometime prior to this case, to Mr. Lockett's case going to trial.

A. And he told you he was going to testify against Mr. Coleman. That's the reason you withdrew from his case."

Hildebrand asked the judge to instruct the jury to disregard the derogatory remarks Michael Lockett made about him. He questioned their relevancy, to which the prosecutor responded, *"It has to do with the credibility of the witness*, your Honor, *and I moved, \*\*\* there should be a disqualification."* (Emphasis added.)[2]

The judge instructed the jury to disregard certain aspects of Michael Lockett's testimony. The following day, the jury was told:

> "[Y]esterday you heard testimony from Michael Lockett. I want you to please disregard any disagreement which occurred involving witness Michael Lockett and Attorney Thomas E. Hildebrand. I also want you to please disregard any disparaging remarks that were made by witness Michael Lockett in reference to Mr. Hildebrand's character."

The instruction did not erase the damage. It did not directly address highly prejudicial messages conveyed to defendant's jury. The jury no doubt considered the possibility that Hildebrand threw Michael Lockett's case because he was standing watch over defendant's interests, that Hildebrand knew about defendant's confession from the Lockett brothers (who confided it to Hildebrand at the first available opportunity), that Hildebrand believed the Locketts and attempted to broker deals and assure outcomes to keep them silent, and that Hildebrand abandoned the Locketts' interests only when his efforts to control their testimony failed.

Defendant now complains of Hildebrand's conflicts. There is no question that Hildebrand labored under a host of them. The State knows this, for it raised the same conflicts in its removal effort. However, the State now questions the nature of those conflicts and argues that defendant must show actual prejudice. The State also argues that defendant waived his right to a conflict-free attorney.

■ We maintain "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160, 100 L. Ed. 2d 140, 149, 108 S. Ct. 1692, 1698 (1988). It is not our purpose to police the practice merely to assure the maintenance of professional ethics. Conflicts of interest in criminal practice implicate an accused's constitutional rights. The

---

[2]The prosecutor was candidly on target. Hildebrand's representation of the Lockett brothers proved quite relevant to their credibility. This was precisely the problem. The State's failed effort to disqualify Hildebrand was based on the prejudice it feared the conflicts might produce. The State's effort to disqualify did not license use of those conflicts to produce that prejudice—at least not without the consequence predicted from the outset.

right to the effective assistance of counsel under the sixth amendment to the United States Constitution entitles a criminal defendant to the undivided loyalty of counsel, free from conflicting interests or inconsistent obligations. *Glasser v. United States*, 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457 (1942); *People v. Washington*, 101 Ill. 2d 104, 461 N.E.2d 393 (1984).

■ An attorney's relationships *vis-a-vis* certain clients can, without more, create a disabling conflict that taints trial's outcome. Counsel's contemporaneous association with either the crime victim or a State's witness forms such a relationship and creates a conflict *per se*. *People v. Spreitzer*, 123 Ill. 2d 1, 14, 525 N.E.2d 30, 34 (1988). Our high court has consistently maintained that conflicts *per se* eliminate any need to show a prejudicial effect in order to secure a conviction's reversal. *People v. Stoval*, 40 Ill. 2d 109, 113, 239 N.E.2d 441, 444 (1968). The *per se* conflict rule " 'is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties.' " *People v. Lawson*, 163 Ill. 2d 187, 210, 644 N.E.2d 1172, 1183 (1994), quoting *People v. Gerold*, 265 Ill. 448, 477, 107 N.E. 165, 177 (1914).

Where defense counsel has represented a State's witness, a *per se* conflict of interest exists if "the professional relationship between the attorney and the witness is contemporaneous with counsel's representation of the defendant." *People v. Free*, 112 Ill. 2d 154, 168, 492 N.E.2d 1269, 1275 (1986); see also *People v. Robinson*, 79 Ill. 2d 147, 402 N.E.2d 157 (1979); *People v. Strohl*, 118 Ill. App. 3d 1084, 456 N.E.2d 276 (1983).

Initially, we note that the State's brief conspicuously addresses only one of counsel's dual representations. The State argues that counsel's representation of prosecution witness Michael Lockett was not contemporaneous with Lockett's testimony and therefore did not constitute a conflict *per se*. We disagree.

The State offers *People v. Flores*, 128 Ill. 2d 66, 538 N.E.2d 481 (1989). We think that case calls for a broader definition of contemporaneous representation than Hildebrand's midtrial withdrawal presupposes and the State's argument would have us apply.

Flores was on trial for murder. A prosecution witness sought representation from Flores' attorney. Flores' attorney had represented the witness on a different matter at an earlier time. *That matter was over.* Flores' attorney advised his former client of the conflict and refused representation. The supreme court noted:

> "[N]othing in the record shows that defense counsel represented Ramos *at the time of defendant's trial*." (Emphasis added.) *Flores*, 128 Ill. 2d at 83, 538 N.E.2d at 487.

■ Hildebrand represented Michael Lockett at the time of defendant's trial. He may not have procured the benefits Lockett was to receive in return for testimony, but he clearly owed a duty to see that Lockett obtained them. He owed that duty when he prepared for trial, interviewed Lockett about his testimony, selected a jury, considered opening statement, and confronted other prosecution witnesses.

The State's view of contemporaneous representation is too narrow. The conflict *per se* rule accepts that certain conflicts spell harm without an actual showing of prejudice. *Stoval*, 40 Ill. 2d 109, 239 N.E.2d 441. The reason is twofold:

"[U]nfairness to the accused, who could not determine whether his representation was affected, even subliminally, by the conflict; and the additional burden placed on defense counsel, by being unnecessarily exposed to later charges of less than faithful representation." *Lawson*, 163 Ill. 2d at 210, 644 N.E.2d at 1183.

These reasons attach to dual representation immediately before trial and during trial's initial phases. Moreover, the duty of confidentiality owed Lockett precluded the use of any helpful information that Lockett may have divulged to Hildebrand.

Hildebrand's withdrawal moments before Lockett testified did not cure the conflict. It merely assured heightened prejudice because of it. The prosecutor made sure the jury knew when Hildebrand quit the watch over Lockett's interests. By so doing, the prosecutor demonstrated that cross-examination was disingenuous. The State made adroit use of Hildebrand's prior representation to bolster Lockett's credibility. Even if Hildebrand's withdrawal was of some import, the conflict still proved prejudicial.

■ Hildebrand's withdrawal raises a far more salient question, one that draws a notable silence from the State. If Hildebrand thought that withdrawal as Lockett's attorney was necessary to free him from a disabling conflict, what was Hildebrand thinking when Watt testified?

The State does not address the representation of Watt. The State's brief simply acknowledges:

"In a supplement to the record on appeal, the defendant has presented portions of the record in *People v. Travon Watt*[,] No. 93—CF—1355 ***. The supplemental record shows that counsel continued to represent Watt subsequent to the trial in the instant case."

Hildebrand represented Watt's competing interests despite statements to the contrary. The extent to which Watt's competing interests actually fettered defendant's defense need not be determined. Watt's

representation constituted a conflict *per se* that removes the need to find actual prejudice.

We note that actual prejudice abounds in the testimony of the Locketts. The crippling effect of the conflicts is manifest. The conflicting representations themselves were placed in issue to enhance testimony and dilute cross-examination.

We hold that the assistance of counsel provided this defendant was constitutionally infirm.

We turn to the question of defendant's waiver of a conflict-free attorney. The question turns on whether the various conflicts Hildebrand labored under were knowingly waived. We note that the question of whether conflicts of this nature can be waived is not before us.

■ It is well settled that trial courts must adequately inform defendants of a conflict's *significance* before any waiver of such a conflict can be accepted. A defendant must actually understand how the conflict could affect his attorney's representation, before his right to a conflict-free attorney can be knowingly waived. *Lawson*, 163 Ill. 2d at 218, 644 N.E.2d at 1187.

Here, defendant was merely informed that Hildebrand represented witnesses for the prosecution, and then he was asked if he had any problem with it. His response indicated that he had no problem provided the contemporaneous representation caused him no harm. The judge should have determined whether defendant fully understood the significance of Hildebrand's conflicting loyalties and further understood how loyalties to prosecution witnesses could hamper Hildebrand's effectiveness. Before a determination of knowing waiver could be made, the judge needed to make sure that defendant understood how Hildebrand's allegiance to the interests of other paying clients, who were key witnesses against defendant, could impair Hildebrand's ability to perform on defendant's behalf.

The first inquiry into Hildebrand's ongoing representations was insufficient to produce a knowing waiver. In fact, defendant said nothing that constituted waiver. Furthermore, defendant was not told of the conflicts' potential harm. Defendant could not have been told. The watch over Watt's interests was declared complete.

The second inquiry into Hildebrand's ongoing representations was directed at Hildebrand rather than defendant. Hildebrand was asked whether defendant understood the ramifications of Hildebrand's conflicts. Instead of answering this critical question, Hildebrand merely insisted that all prosecution witnesses save Michael Lockett were former clients. There was never any explanation of what Hildebrand's conflicts were or what they potentially meant. Nor was defendant's understanding of Hildebrand's conflicts ever determined.

Hildebrand's recital erroneously suggested that any potential harm could be cured by a midtrial withdrawal from Lockett's representation, and his recital erroneously declared Watt a prior client.

The judge followed Hildebrand's recital by asking whether defendant understood the possible conflict his attorney just mentioned. This inquiry was too limited. It was also deficient in its reliance upon the accuracy of Hildebrand's statements.

Finally, after Michael Lockett's testimony, the prosecutor sought to confirm waiver for a third time. The court addressed defendant:

"THE COURT: Mr. Coleman, I have asked you before. Any problems with Mr. Hildebrand representing you?
DEFENDANT COLEMAN: No, sir."

This last inquiry into defendant's willingness to surrender the right to a conflict-free attorney suffers from the same deficiencies present in earlier inquiries. Defendant was oblivious to the conflicts' true nature and significance. Indeed, he was apparently oblivious to the message those conflicts had just conveyed to the jury.

Despite its effort, the State did not perfect a knowing waiver. Defendant's initial assent to Hildebrand's conflicts was conditioned upon the conflicts producing no harm. Defendant was never told of the potential harm those conflicts could produce, and what he was told was seriously inaccurate.

Defendant's willingness to allow Hildebrand's continued representation was not only an uninformed act; it was a misinformed act. Defendant was unaware of his lawyer's ongoing loyalty to the competing interests of a key witness for the prosecution. Under such circumstances, we cannot say that defendant knowingly surrendered his right to a conflict-free attorney.

In conclusion, we are not making a finding as to defendant's guilt or innocence that would be binding on retrial; rather, we consider the evidence in order to protect defendant's constitutional right against double jeopardy. See *People v. Williams*, 182 Ill. 2d 171, 192-93, 695 N.E.2d 380, 391 (1998). We find that, under the evidence presented, a retrial of defendant would not constitute double jeopardy. *Williams*, 182 Ill. 2d at 193, 695 N.E.2d at 392.

For the reasons set forth herein, defendant's convictions are reversed, and this case is remanded to the Madison County circuit court for further proceedings.

Reversed and remanded.

WELCH, P.J., and HOPKINS, J., concur.