26 April 2000

NO. 5-99-0331

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  St. Clair County.

)

)  No. 88-CF-625

)

RODNEY J. WOIDTKE, )  Honorable

)  Richard A. Aguirre,

     Defendant-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE CHAPMAN delivered the opinion of the court:

Defendant was convicted of the first-degree murder of Audrey Cardenas by the court sitting without a jury on August 25, 1989.  Defendant was sentenced to 45 years' imprisonment on September 28, 1989.  After an unsuccessful petition for relief from judgment, defendant took a direct appeal, and this court affirmed his conviction.  See 
People v. Woidtke
, 224 Ill. App. 3d 791, 587 N.E.2d 1101 (1992).  Defendant filed a 
pro se
 postconviction petition in July 1992, but no hearing was ever had on the petition.  There was very little activity in defendant's case until January 1998, when Public Defender Brian Trentman, who had represented him since his indictment in 1988, withdrew as counsel for defendant.  Defendant's current counsel, Jenkins & Kling, entered on his behalf on March 23, 1998.  Defendant filed an amended petition for postconviction relief on May 5, 1998.  The court dismissed all but one of the claims in defendant's petition.  The court conducted an evidentiary hearing on the remaining claim of conflict of interest and, following the hearing, ruled in the State's favor.  It is from the court's rulings on defendant's postconviction petition claims that defendant now appeals.  We reverse and remand.

BACKGROUND

In order to fully analyze the issues in defendant's postconviction petition, we find it necessary to first review the evidence presented at defendant's trial.  Audrey Cardenas was hired as an intern at the Belleville News-Democrat (News-Democrat) in the summer of 1988, and she moved to the Belleville area around June 9, 1988.  Cardenas was assigned to follow reporter Carolyn Tuft, and other reporters, on their News-Democrat beats from June 15 through June 17, 1988.  June 19, 1988, was the last time anyone saw Cardenas alive.  Her body was found in a creek behind Belleville East Township High School on June 26, 1988.  Cardenas's body was partially decomposed when found, and though the medical examiner was not able to determine a cause of death, she did deem the death a homicide.  The medical examiner stated her findings indicate that Cardenas did not die from a blow to the head.  

On June 26, 1988, the day the Cardenas body was discovered in the creek, defendant Rodney Woidtke was seen by police officers inside the area of the crime scene, which was marked off by crime scene tape.  Detective Boyne of the Belleville police tried to stop defendant, who advanced to within 150 yards of the officers in the crime scene area, but defendant was staring and nonresponsive to his command to stop.  Defendant was carrying a knapsack, which he allowed the police to search.  The knapsack contained personal items belonging to defendant, including letters regarding sexual fantasies of defendant.  The officers decided to take defendant to the police station to be questioned. 

Once at the police station, defendant was put in an interview room with Detectives Boone and Wagner.  Boone admitted that he said to defendant in a "firm voice," "You did this–didn't you?"  Defendant told the officers that he did not kill or hurt anyone.  Boone then asked defendant some questions regarding his sexual preference, which upset defendant a great deal.  He stated that he "didn't want to be a homo[sexual]," and he refused to speak any more with Boone.  Boone left the room and Wagner continued the questioning of defendant.  In the interview, defendant stated that he had previously been in a mental institution in Alton and that he hears voices.  He also said that he has always had problems relating to women.   Defendant then went on to describe his involvement in what happened to Cardenas.  He stated that he wanted to have sex with Cardenas but she refused.  He said he pulled her clothes off, and she ran away.  He claimed that he then hit her in the head with a pipe and tried to rape her but was unsuccessful.  He then claimed that he put her pants back on her and left her.  He said he did not zip her pants back up before he left her.  

Boone then asked defendant where he kept his clothes, since defendant claimed that he lived in the woods.  Defendant offered to take the officer to where his clothes were.  On the way to retrieve his clothes, defendant told Boone that he made up the confession and that he did not do anything to Cardenas.

Boone told defendant twice during the interview not to confess if he was not involved in the Cardenas murder.  When asked why he so advised defendant, Boone stated that it was because he had doubts about whether defendant was being truthful.  In fact, Boone told defense counsel one month before the trial, and testified at trial, that he was still not sure that defendant committed the murder.

Sargent Heffernan also interviewed defendant on June 26, 1988.  Defendant told Heffernan that he killed Cardenas but did not rape her.  He stated that he did not hit Cardenas with a pipe and that when he left her, he thought she was still alive.  Defendant alleged that Cardenas was wearing white, pink, and blue clothes when he attacked her.  Heffernan testified that in his opinion, at the time of the interview, there was no doubt that defendant had mental problems.  Defendant requested that Heffernan allow him to speak with a female detective.

Debra Morgan, a criminal investigator, was brought in to interview defendant on June 28, 1988.  Defendant told Morgan that he asked to speak with her because he was afraid that the male police officers would think that he was homosexual because of his habit of putting his hands in his lap.  He also stated that he lied to the other officers and that he thought that they were going to find him guilty just because he was at the crime scene.  He was convinced then that he would spend his life in jail.  When Morgan questioned defendant about his encounter with Cardenas, defendant told her that he tried to have sex with Cardenas and that she fought him and tried to run away.  He said that he hit her in the head with a pipe three or four times.  He stated that when he attacked her, he saw tattoos on Cardenas's legs and that she was wearing a pink, blue, and white shirt, purple shorts, and high-heeled shoes.  He also said that he did not see her jogging on the track at the high school and that she was not sweating and did not in any way appear as though she had been exercising.

Defendant's mental health was analyzed by Dr. Daniel Cuneo, who testified at trial that defendant is a schizophrenic paranoid type.  Defendant is extremely paranoid, hears voices, and is preoccupied with sex.  Dr. Cuneo testified that he believes that defendant claimed to have had sex with Cardenas to prevent police from thinking that he was homosexual.  In fact, when Boone asked defendant at the initial interview if he was homosexual, it may have triggered defendant's subsequent confessions.  Defendant's fear of being perceived as a homosexual was conveyed repeatedly to Dr. Cuneo.  He even stated that he was sometimes afraid to eat, since the act of putting food in his mouth could be seen as similar to performing fellatio and defendant would therefore be seen as homosexual.  Dr. Cuneo stated that he believed that at the time he gave his statements to the police, defendant was hallucinating, actively schizophrenic, delusional, and unmedicated.  These factors, in Dr. Cuneo's opinion, explain the inconsistency of defendant's statements.  Therefore, in July 1988, Dr. Cuneo deemed defendant unfit to stand trial.  In July 1989, after defendant was medicated and received therapy for one year, Dr. Cuneo determined that defendant was able to stand trial.  

Defendant was charged with the murder of Audrey Cardenas on August 16, 1988.  Brian Trentman of the Public Defender's office was appointed to represent defendant.  Thereafter, defendant was found unfit to stand trial and was remanded to the custody of the Chester Mental Health Center until July 1989, when he was found fit to stand trial.  Defendant waived his right to a jury and was tried before Judge Aguirre during the week of August 22 to August 25, 1989.  On August 25, 1989, defendant was found guilty of the murder of Cardenas, and on September 28, 1989, he was sentenced to 45 years' imprisonment.

On September 27, 1989, Jolaine Lanman and her three-year-old son were murdered in their home.  Dale Anderson was convicted of the Lanman murders, and this court upheld his conviction. See 
People v. Anderson
, 237 Ill. App. 3d 621, 604 N.E.2d 546 (1992).  Before he murdered Jolaine Lanman, Anderson forced her to write a note stating that the people who killed her also killed Cardenas.  The note listed the license plate numbers of Anderson's supervisors at the Illinois Department of Public Aid.  

On October 2, 1989, defendant filed a 
pro se
 petition for relief from judgment, alleging that the murder of Jolaine and Kenneth Lanman were similar to the Cardenas murder.  The court appointed Trentman to represent defendant in his petition for relief from judgment.  Trentman never filed a supplemental petition for relief detailing the similarities of the Lanman and Cardenas murders.  In July 1992, defendant filed a 
pro se
 postconviction petition alleging trial error and ineffective assistance and requesting counsel other than Trentman.  On August 14, 1992, the court appointed Trentman to represent defendant in his postconviction efforts.  On October 31, 1994, defendant wrote a letter to the clerk of the St. Clair County Circuit Court, stating he believed that Trentman had withdrawn from his case and requesting that new counsel be appointed.  In the record, there is no response to this request.  On January 12, 1998, after Trentman was elected State's Attorney in Washington County, he withdrew as counsel for defendant.  No hearing on defendant's postconviction petition was held between 1992 and 1998.

Defendant's current counsel was allowed to enter on behalf of defendant and filed his amended petition for postconviction relief on May 5, 1998.  The petition alleged a freestanding claim of innocence based on newly discovered evidence that someone else was responsible for the Cardenas murder.  It also asserted that defendant did not receive effective assistance of counsel due to several trial errors and due to the fact that Trentman was laboring under a conflict of interest during his representation of defendant.  

Without an evidentiary hearing, the court dismissed defendant's claims with respect to his freestanding claim of innocence and his claims of ineffective assistance of counsel due to various trial errors.  The only remaining issue from the amended petition was defendant's claim that he was provided ineffective assistance of counsel because his court-appointed public defender labored under a conflict of interest between his representation of defendant and his representation of Dale Anderson, another client.  After a hearing on this issue, the court denied this claim for relief in an order dated April 14, 1999.  It is from the court's orders on the amended petition that defendant currently appeals.

DISCUSSION

First, defendant claims that the trial court erred in dismissing without an evidentiary hearing his claim of freestanding innocence based on newly discovered evidence.  Illinois law provides that an evidentiary hearing on a postconviction petition is required when the petition makes a substantial showing of a violation of defendant's constitutional rights. See 
People v. Coleman
, 183 Ill. 2d 366, 381, 701 N.E.2d 1063, 1072 (1998).  A dismissal is warranted only when defendant's allegations of fact, liberally construed in favor of defendant and in light of the original trial record, fail to make a substantial showing of imprisonment in violation of the constitution.  See 
Coleman
, 183 Ill. 2d at 382, 701 N.E.2d at 1072.  The appropriate standard of review where a postconviction petition has been dismissed without an evidentiary hearing is that of plenary review.  See 
Coleman
, 183 Ill. 2d at 389, 701 N.E.2d at 1075.  Since "the circuit court is not in an appreciably better position than the reviewing court to determine whether the allegations contained in the post[]conviction petition demonstrate a constitutional deprivation," the reviewing court should have the power to substitute its judgment for that of the lower court in reviewing the dismissal.  
Coleman
, 183 Ill. 2d at 388, 701 N.E.2d 1075.

In 
People v. Washington
, 171 Ill. 2d 475, 665 N.E.2d 1330 (1996), our supreme court set forth the constitutional issues at play in freestanding claims of innocence.  The court held that, as a matter of Illinois constitutional jurisprudence, a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process.  
Washington
, 171 Ill. 2d at 489, 665 N.E.2d at 1337.  The court went on to state that the standard of proof is "compelling evidence of actual innocence," which requires new, material, noncumulative evidence that "would probably change the result on retrial."  
Washington
, 171 Ill. 2d at 489, 665 N.E.2d at 1337.

In support of his claim of freestanding innocence, defendant asserted a considerable amount of newly discovered evidence.  The crime scene technician for the Cardenas case, Dee Heil, submitted an affidavit on April 16, 1998, stating that defendant's statements to the police in June 1988 did not match what was found at the crime scene.  Specifically, defendant told police that Cardenas had been wearing blue denim tube shorts, which he put back on her after he attacked her but did not zip.  In fact, at the crime scene, police found pink running shorts, which did not have a zipper, lying next to Cardenas's body.  Defendant stated that Cardenas wore skimpy shoes, like high heels, which he left near her body.  Cardenas was actually found wearing her running shoes.  Heil averred that defendant was asked to draw a map of the area in which he attacked Cardenas, and that map did not substantially match the actual area of the creek behind Belleville East Township High School.  Heil also stated in his affidavit that defendant knew that there was a pipe found at the scene of the crime because Detective Boone provided that information to defendant during the police interrogation. 

On July 30, 1992, Heil stated that he interviewed Dale Anderson at the Correctional Center in Pontiac, Illinois, where he was incarcerated for life without parole for the murder of Jolaine and Kenneth Lanman.  In that interview, when Heil asked how Cardenas was killed, Anderson stood up and made movements and gestures showing that she was strangled from behind.  Heil and Anderson also had the following exchange during the interview:

Heil: "Dale, we both know Rodney Woidtke did not kill Audrey Cardenas, don't we?"

Anderson: "Yes." 

Heil: "We both know who really killed Audrey Cardenas, don't we?"

Anderson: "Yes."

Heil: "The person that killed Audrey Cardenas is doing life in prison without parole for a double homicide, isn't he?"

Anderson: "Yes."

Dale Anderson, an employee of the Illinois Department of Public Aid, began complaining to the police in June 1988 about alleged fraudulent activities by his three supervisors.  Also, in early June 1988, Anderson convinced Carolyn Tuft, a reporter at the News-Democrat, to write an article about the fraud committed by his supervisors.  After the story ran, Anderson invited Tuft to his home to try to convince her to run another story about his supervisors.  Tuft's affidavit reveals that when she refused, Anderson locked her in his home and brandished a gun.  On June 9, 1988, Anderson was suspended from his job, and he was subsequently fired, but he continued to press News-Democrat reporters to run another story about his supervisors.  On the evening of June 9, 1988, Anderson was caught in the offices of the News-Democrat after business hours.  On June 10, 1988, Anderson waited for Tuft outside the News-Democrat offices and tried to get her to go with him in his car to a rural area where he claimed his supervisors had shot at him, but she refused to go.  Tuft spoke with the police about Anderson's behavior and stated that she was afraid of Anderson.

On June 15, 1988, Cardenas began accompanying Tuft on her beat for the News-

Democrat.  Cardenas was last seen alive on June 19, 1988.  On June 23 and 24, 1988, Anderson placed calls to the News-Democrat saying that his supervisors were responsible for Cardenas's disappearance, and he gave the license plate numbers of the supervisors.  This may be of significance since, before murdering Jolaine and Kenneth Lanman, Anderson forced Jolaine to write a note saying that Anderson's three supervisors were responsible for killing her, as well as for Cardenas's murder, and he listed their license plate numbers.  On June 26, 1988, Cardenas's body was found.  Anderson attended Cardenas's memorial service two days later, on June 28, and he was observed there by Belleville police officers.

When Dale Anderson's home was searched, after the murder of the Lanmans, police discovered additional evidence that is of significance in the Cardenas case.  A personal diary belonging to Anderson was found.  The diary stated that he had been with Cardenas on the day of her disappearance and that he had been jogging with her.  He wrote that she ran ahead of him and he lost her, so he went back to her apartment to clean up and wait for her.  He later told police that Cardenas had been at his home on June 18, 1988, the day before she disappeared.  

On July 11, 1988, Anderson went to the home of Theresa Angleman.  He told Angleman that he was an investigator in the Cardenas murder, and he stayed in her home for a while, asking her questions.  When Angleman became nervous and wanted Anderson to leave, he told her to be careful leaving work at night, because Cardenas had been in the practice of running at night.  Angleman was shaken by the encounter and filed a complaint with the police.  When Anderson was arrested for posing as a police investigator, he had possession of a bag that contained two police badges, a police scanner, and a file on the Cardenas murder.  

Anderson also placed a phone call on July 27, 1988, to Bonds Robinson, Jr., an Illinois Liquor Control Commission agent, in which he accused his supervisors of Cardenas's murder, stated that the police were covering up facts related to the case, and claimed to have Cardenas's newspaper notebooks in his possession.  He told Robinson that Cardenas had been "murdered and kidnaped."  

Veronica Denton, a friend of Anderson's teenage daughter, testified that on July 29, 1988, Anderson gave her two letters that he had written himself and he asked her to copy them in her own handwriting.  The letters said that Denton had been at Anderson's house when Cardenas had come to discuss a news article she was writing about Anderson's supervisors.  The letters went on to state that Denton heard Cardenas say that the supervisors threatened Cardenas and that she was afraid of them.  However, Denton testified that she was not at Anderson's house at any time when Cardenas was also present.

On September 29, 1989, two days after the Lanman murders, a wall safe in Anderson's home was searched.  It contained two guns, various newspaper articles about the Cardenas murder, a phony police report written by Anderson about the Cardenas investigation, and the student identification card of an individual named Jorge Campos Cardenas.

During the search of Anderson's home, police also seized four briefcases.  Two of the briefcases were bought on June 19, 1988, the day of Cardenas's disappearance, and the other two were purchased on June 20, 1988.  The briefcases contained surgical gloves, sections of cord, a hunting knife, a push-button knife, a police scanner, two pocket knives, a pin with the FBI insignia, newspaper clippings on the Cardenas murder, and a false police report which stated that there was no witness or evidence to link defendant to the Cardenas murder.

Anderson was charged with and was found guilty of the murders of Jolaine and Kenneth Lanman.  Those murders occurred on September 27, 1989, one day before defendant's sentencing.  As previously stated, before he killed Jolaine Lanman, Anderson forced her to write a note saying that Anderson's supervisors killed the Lanmans and Cardenas.

On January 1, 1996, Trentman sent a letter to defendant, enclosing a letter Trentman had received from Anderson.  Anderson claimed to have information regarding the Cardenas murder and stated that defendant was not guilty of the murder.  In his letter to defendant, Trentman stated:  "Enclosed is a letter from Dale Anderson–who I think there is much more evidence to suggest he's responsible for the death of Audrey Cardenas.  * * *  I would like to see him tried and convicted and you released." 

Defendant claims that the above-recited evidence was discovered after defendant's trial, when police began investigating the Lanman murders.  Based on this newly discovered evidence, we conclude that it was error for the trial court to dismiss without a hearing defendant's claim of freestanding innocence.  
Washington
, 171 Ill. 2d at 489, 665 N.E.2d at 1337.  

Defendant's next argument on appeal is that the trial court's dismissal of his claim of ineffective assistance due to a conflict of interest was manifestly erroneous.  In reviewing the dismissal of a petition for postconviction relief after an evidentiary hearing, the proper standard for the reviewing court is whether the trial court's action was manifestly erroneous. See 
People v. Coleman
, 183 Ill. 2d 366, 385, 701 N.E.2d 1063, 1073 (1998).

Regardless of whether a defendant is represented by a public defender or a private practitioner, a criminal defendant has a constitutional right to the undivided loyalty of counsel, free of conflicting interests.  See 
People v. Coleman
, 301 Ill. App. 3d 290, 298-99, 703 N.E.2d 137, 143 (1998).  The Illinois Supreme Court has stated that "no man can serve two masters."  
People v. Spreitzer
, 123 Ill. 2d 1, 13, 525 N.E.2d 30, 34 (1988).  Counsel is deemed constitutionally ineffective where his allegiance is "diluted by conflicting interests or inconsistent obligations."  
Spreitzer
, 123 Ill. 2d at 13-14, 525 N.E.2d at 34; 
People v. Washington
, 101 Ill. 2d 104, 110, 461 N.E.2d 393, 396 (1984).

Where defense counsel has a tie to a person or entity, including his "own previous commitments," which would benefit from an unfavorable verdict for the defendant, a 
per se
 conflict arises.  See 
Spreitzer
, 123 Ill. 2d at 16, 525 N.E.2d at 35.  In such cases, the knowledge that a favorable result for defendant would inevitably conflict with the interests of counsel's other clients or employer might "subliminally" affect counsel's performance in ways difficult to detect and demonstrate.  See 
Spreitzer
, 123 Ill. 2d at 16, 525 N.E.2d at 35.  Hence, in these cases, the courts have reversed convictions unless the record reflects that the defendant has been made aware of the conflict and has knowingly waived his right to conflict-free counsel.  See 
Spreitzer
, 123 Ill. 2d at 17, 525 N.E.2d at 36.  Where counsel has such a conflict of professional interest, the defendant is not required to show prejudice as a result of the representation; the representation is simply ineffective 
per se
.  See 
Spreitzer
, 123 Ill. 2d at 15, 525 N.E.2d at 36.

In his postconviction petition, and at the evidentiary hearing on the petition, defendant asserted that his court-appointed defender, Brian Trentman, was laboring under a 
per se
 conflict of interest during his representation of defendant.  Trentman began representing defendant in August 1988, when defendant was charged with the murder of Audrey Cardenas.  Trentman also represented Dale Anderson from August 1988, until some time in January 1989.  The representation of Anderson was for several misdemeanor charges of impersonating an officer and obstructing justice, which arose when Anderson was accused of presenting himself to several individuals as an investigator in the Cardenas murder case.

Trentman admitted at the hearing that he never made defendant or Anderson aware of the fact that he was representing both of them for charges stemming from the murder of Cardenas.  He also admitted that he did not make the court aware of this possible conflict of interest.

At the hearing, there was testimony from Trentman and several officers involved in the Cardenas investigation that Dale Anderson was at various times considered a suspect in the murder.  In fact, Trentman's handwritten notes, made before defendant's trial, reflect Dale Anderson as a suspect in the investigation and a possible witness for defendant.  These notes were made after Trentman represented Anderson at his misdemeanor trial in December 1988.  Trentman indicated at the hearing that he was aware as early as July 1988 that Dale Anderson was presenting himself as a Belleville police officer investigating the Cardenas murder.  Trentman actually issued a trial subpoena to Dale Anderson on August 23, 1989, for his testimony in defendant's case-in-chief in his murder trial.  Anderson was never called as a witness in defendant's case. 

When Anderson was questioned by the police in July 1988 after his arrest for impersonating a police officer, he was asked about his knowledge of the Cardenas murder and whether he was directly or indirectly involved in the murder.  Anderson declined to answer the questions on advice of counsel but agreed to take a polygraph test relating to his knowledge of the facts of the Cardenas murder.  However, the next day he refused to submit to the polygraph test.

During his representation of Dale Anderson on the misdemeanor charges, Trentman filed a motion to have Anderson's personal property, which was seized upon his arrest, returned to him.  This evidence consisted of a black briefcase that contained two police badges, a police scanner, and a file containing information about the Cardenas murder.  At the time Trentman filed this motion, the evidence he sought to recover on Anderson's behalf was actually in the evidence file of the Cardenas murder investigation.   

In addition, attorney Jeffrey Hammel testified that in approximately 1994, he had a brief meeting with a Richard Woidtke, defendant's brother.  Richard Woidtke asked Hammel if he would represent defendant in his postconviction efforts.  Hammel testified that, after only a 10- to 15-minute meeting, he refused the representation of defendant due to what he deemed a conflict of interest, since he had a prior attorney/client relationship with Dale Anderson.

We conclude that this evidence is sufficient to show that a 
per se
 conflict of interest existed in Trentman's representation of defendant and Anderson.  As Anderson's attorney, Trentman should have, and admittedly did, realize that Anderson was a suspect in the Cardenas murder.  However, he did not withdraw from his representation of defendant.  We think this is a clear demonstration of a "tie to a person *** which would benefit from an unfavorable verdict for the defendant" (
Spreitzer
, 123 Ill. 2d at 16, 525 N.E.2d at 35), since Anderson would likely no longer be pursued as a suspect after defendant's conviction for the murder of Cardenas.  

The State counters this 
per se
 conflict argument by alleging that Anderson would not benefit from defendant's conviction because he could still be accused of the murder if evidence of his involvement were ever found.  As a practical matter, however, it is unlikely that such evidence would be actively pursued after defendant's conviction and sentencing.   The State also alleges that there was no conflict of interest because although Trentman was appointed to represent defendant in August 1988, defendant was found unfit for trial until July 1989 and was in the Chester Mental Health Center during that period.  It was while defendant was deemed unfit that Trentman represented Anderson on his misdemeanor charges of interfering in the Cardenas murder investigation.  Hence, the State argues, no conflict of interest existed.  We find this argument unpersuasive.  In fact, Trentman's attorney/client relationship with Anderson, a suspect in the Cardenas murder, while defendant was found unfit for trial supports our finding of a 
per se
 conflict of interest.  Trentman would be obligated by the nature of his representation of Anderson to protect as privileged any information he obtained in Anderson's involvement in the Cardenas murder.  By then not withdrawing as defendant's counsel, subpeonaing Anderson, and failing to call him as a defense witness, Trentman strengthened the appearance of a 
per se
 conflict.

The State takes the position that because Trentman was not representing Anderson when defendant's case went to trial, no 
per se
 conflict existed.  Trentman began representing defendant in August 1988, but defendant did not stand trial until August 1989.  Trentman began representing Anderson in August 1988 and, after a trial on a misdemeanor charge, withdrew as counsel for Anderson in January 1989.  Therefore, since seven months passed between Trentman's withdrawal as Anderson's counsel and defendant's trial, the State argues that no 
per se
 conflict of interest arose because the representation was not simultaneous.

Although there may have been some merit to the State's argument in the past, it is contrary to the holding of 
People v. Coleman
, 301 Ill. App. 3d 290, 703 N.E.2d 137 (1998).  In 
Coleman
, the defendant's attorney represented both the defendant and a witness for the State.  
Coleman
, 301 Ill. App. 3d at 300, 703 N.E.2d at 141.  The attorney withdrew as the State witness's attorney just minutes before the witness took the stand to testify against the defendant.  
Coleman
, 301 Ill. App. 3d at 300, 703 N.E.2d at 141.  The court found that a 
per se
 conflict of interest existed because, even though counsel withdrew as the witness's attorney during the trial, he was laboring under a duty both to the defendant and the witness during the time he was preparing for the defendant's trial, creating a 
per se
 conflict of interest.  
Coleman
, 301 Ill. App. 3d at 300-01, 703 N.E.2d at 144.  Hence, the court held that the attorney's withdrawal did not cure the conflict.  
Coleman
, 301 Ill. App. 3d at 300, 703 N.E.2d at 144.

The State points out that in 
Coleman
 the attorney withdrew during the defendant's trial, and here Trentman withdrew from his representation of Anderson seven months before defendant's trial.  The short lapse of time may make the conflict more apparent in 
Coleman
, but we conclude that the length of passage of time is only one factor to be considered in determining the existence of a conflict.  Given the circumstances of this case, we conclude that a 
per se
 conflict existed.

Although we do not believe that Trentman, who had only been practicing law for a little more than a year at the time of defendant's trial, intentionally endangered the integrity of his representation of defendant, Anderson, or any other client, we cannot ignore the inherent "conflicting interests or inconsistent obligations" of contemporaneously, or nearly contemporaneously, representing defendant and Anderson.  See 
Spreitzer
, 123 Ill. 2d at 13-

14, 525 N.E.2d at 34.  

Therefore, on this point alone, we are compelled to reverse defendant's conviction and remand for a new trial if the State chooses to pursue the prosecution of defendant.

Finally, in his amended petition, defendant alleged several other errors of his trial counsel that denied him effective assistance of counsel.  The trial court dismissed these claims of error without a hearing.  Given our disposition of the other issues, it is unnecessary to address these additional claims. 

CONCLUSION

For the foregoing reasons, we reverse the trial court's denial of that portion of  defendant's postconviction petition that was based upon its finding that there was no 
per se
 conflict of interest, and we remand for a new trial.  In view of our disposition of this case, on remand defendant is entitled, through his new counsel, to proceed anew in all respects, from his decision to waive or not waive a jury and through all other aspects of the trial.

Reversed; cause remanded.

WELCH, J., concurs.

JUSTICE MAAG, specially concurring:

I concur in all respects with the majority opinion.  I write separately solely to state my strong personal belief that the actions of the trial court and counsel in allowing the defendant's postconviction petition to languish for 
years
 without even a hearing are unconscionable.  I can perceive of no reasonable explanation for such conduct.  I am confident, given our disposition, that this matter will now receive 
immediate attention
 and be concluded promptly, whatever the outcome.