2015 IL App (4th) 130847

NO. 4-13-0847

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| DEMARCO POOLE, | ) | No. 12CF678 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John W. Belz, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE POPE delivered the judgment of the court, with opinion. Justices Steigmann and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1        In August 2013, a jury convicted defendant, Demarco Poole, of armed robbery (720 ILCS 5/18-2(a)(2) (West 2010)), aggravated battery (720 ILCS 5/12-3.05(f)(2) (West 2010)), and theft (720 ILCS 5/16-1(a)(1) (West 2010)).  In September 2013, the trial court sentenced defendant to concurrent prison terms of 28 years for armed robbery, 5 years for aggravated battery, and 5 years for theft.

¶ 2        Defendant appeals, arguing a *per se* conflict of interest existed during trial where his attorney contemporaneously represented defendant and his girlfriend, Amber Graves, who was called by the State to testify as a hostile witness.  We reverse defendant's conviction and remand with directions for a new trial.

¶ 3                                I. BACKGROUND

¶ 4        On July 6, 2012, at approximately 3 p.m., three men entered Pease's Candy Shop in Springfield and conducted an armed robbery. Brighid Gallagher, one of the employees working at the time of the robbery, was struck in the back of the head after turning around to weigh some candy at the request of one of the men. Gallagher was also struck in the face and sustained a bloody nose while the men were trying to get her to open the safe. Gallagher got a good look at one of the three robbers' faces. One of the men had a gun, which he held to Gallagher's head in an attempt to get her to open the safe. The man told Gallagher "he couldn't believe [she] was going to die for [her] job."

¶ 5        Lindsay Nation, the other employee working at the time of the robbery, reported one of the men put a gun to her head during the robbery. Nation was then "very aggressively" dragged around on the floor by her hair. The man dragging her wore a green bandana to cover his face. The men were asking her whether she was willing to die for her job and telling her they were going to hurt her if she did not open the safe. Just prior to leaving, the men ripped down one of the store's three surveillance cameras. The men took $780 cash as well as the employees' cell phones. The safe was never opened.

¶ 6        During the course of his investigation, Springfield police sergeant Josh Stuenkel and Detective Stephen Welsh took a bulletin showing images from the store's surveillance video to a nearby apartment complex. The building manager was able to immediately identify two of the suspects involved. One of the suspects the manager identified was defendant's brother, Michael Poole. The store employees identified Michael from a photo array as one of the individuals involved in the robbery. The manager also identified Towan Davis. Following his arrest on unrelated charges, Davis confessed to his role in the robbery. However, he did not

identify the other two men involved.

¶ 7        During their attempt to locate Michael, police visited his mother's house and met defendant, who was there with his girlfriend, Amber Graves.  Police noted defendant was "very inquisitive" regarding their interest in Michael's arrest and asked them about any other evidence they had.  Sergeant Stuenkel "immediately recognized similarities between [defendant] and *** suspect number [three]."  According to Stuenkel, defendant's body shape and physical size were "very similar" to the third suspect.  At that point, defendant became a suspect in the robbery.

¶ 8        Thereafter, Graves was arrested and charged with forgery and theft offenses unrelated to the robbery.  During questioning, Detective Welsh showed Graves pictures and video from the robbery.  Graves told Welsh she and defendant were at a casino in Peoria on the day of the robbery.  Casino surveillance video from July 6, 2012, showed defendant wearing a "lighter colored grayish T-shirt" and "some type of gym short with a stripe down the side of them that appear[ed] to be grayish or bluish in color."  (The Pease's video showed the third suspect was wearing a grey t-shirt and grey shorts.)  Police then arrested defendant.

¶ 9        On August 13, 2012, the State charged defendant with armed robbery (counts I and II), aggravated battery (count III), and theft (in excess of $500) (count IV).

¶ 10        After defendant's arrest, Detectives Keith Williams and Mark Pointer interviewed Graves.  During the interview, Graves told Williams after they left the casino she drove defendant to a house on MacArthur Boulevard so he could meet his brother Michael.  Graves stated defendant did not change clothes between the time they left the casino and when she dropped him off to meet his brother.  Approximately 20 to 25 minutes later, she received a call from defendant who wanted her to pick him, Michael, and Davis up in the parking lot of the Don

Smith paint store, which is located near Pease's candy store. After picking up the three men, Graves heard Davis state, "I hit that bitch in the head with a gun and I don't give a fuck."

¶ 11    During defendant's jury trial, the State called Graves to the stand to testify. Before any questions were put to her, the State asked the trial court if it could treat her as a "hostile witness" for purposes of its direct examination. The court, absent any objection from defendant, allowed the State's request. Graves testified she had been defendant's girlfriend for the past three years and was in love with him. During the direct examination, the State asked Graves the following question: "You told detectives at the time of your interview that you got back from Peoria and dropped the Defendant off with his brother, right?" Graves responded, "I had told them that." The State also asked Graves if she later picked defendant, his brother, and Davis up at the paint store. Graves responded, "Yes, that's what I said." The State then asked whether she told police Davis stated "I hit the bitch in the face with the gun." Graves responded, "Yeah, that's what I told them." On cross-examination and again on redirect, Graves explained statements she made to police were false and she lied to them. Graves testified her sister worked at Pease's and she was friends with the girls who work there, which is why she was able to relate details of the robbery to the police.

¶ 12    Tony Polk, a police informant, was in the Sangamon County jail at the same time as defendant. According to Polk's testimony, defendant told him he and his brother robbed the "Peas" candy store and that Graves "was supposed to be the getaway driver."

¶ 13    Following the trial, the jury found defendant guilty of armed robbery, aggravated battery, and theft.

¶ 14    On August 20, 2013, on its own motion, the trial court held a hearing to investigate a potential conflict of interest which had recently come to its attention. According to the court, it was unaware of the contemporaneous representation of defendant and Graves by attorney Daniel Fultz prior to trial. Fultz apologized to the court and explained as follows:

> "[I]t wasn't a direct conflict and that's why it was less of an issue for us in that regard because Ms. Graves's case is a forgery case that is not a case related to [defendant's] case.
>
> Ms. Graves had come to me regarding representation of [defendant]. She had at some point after I began to represent [defendant] told me that she had a pending forgery case of her own, [and] had talked to me about representing her on that. We had talked about my concern that I didn't know what was going to happen as far as her testimony in his case and that could create a direct conflict.
>
> She advised me on a number of occasions that she had lied to the police, that she was not a witness who was going to be in direct conflict to [defendant] because she was going to tell the Jury the truth that she had lied to the police.
>
> At that point because it was a potential conflict, I did ask for a written waiver and received that, and I believe [the State] has that and it's on file."

¶ 15    The waiver, which was signed by both defendant and Graves but undated, stated the following:

"Amber Graves and Demarco Poole [(defendant)] are aware that the same attorney, Daniel Fultz, represents them in their pending cases in Sangamon County. Demarco is charged with Armed Robbery of the Pease's Candy Store. Amber is charged with cashing a forged check. Both parties understand that, while the two cases are unrelated, Amber could be called as a witness to testify against Demarco in his case. Both parties waive any potential conflict that may exist and affirmatively state that they wish for Daniel Fultz to be their attorney in their respective cases."

¶ 16    The following discussion then took place between the trial court, Fultz, and the Sangamon County State's Attorney, John Milhiser:

"THE COURT: *** [J]ust so the Court has an understanding, [Graves] is considered by you to be a defense witness.

MR. FULTZ: Yeah, I mean, I will tell you that I questioned her specifically about that issue because I was afraid that it could create a conflict in trial if she testified in conformity with her written statement. She told me that she had lied to the police and she was not going to do that [on the stand]. I never—I never ever got anything to the contrary from her. In fact, that's exactly what she said.

THE COURT: And the State called her as an adverse witness.

MR. MILHISER: Yes, Judge, and prior to trial, we made

- 6 -

attempts to meet with her and she refused to meet with us giving us the indication that she was not cooperative and she was not cooperative with the State, and then we did call her as a hostile witness, and she did recant and indicated that the prior statements she had given to the police were lies.

So, I mean, in essence, while she was called by us, she was, in essence, a defense witness, and [as a result,] we called her as a hostile witness."

¶ 17 At the conclusion of the hearing, the trial court found the following:

"I think under the circumstances *** it would appear at this point that [Graves] was a defense witness.

I note for the record [Graves] stated on the stand they were still in a relationship. The State called her as an adverse witness. I think it was clear throughout that she was testifying for the [d]efendant, and, in fact, would have testified for the [d]efendant but for the State calling her as an adverse witness first. I don't think there is any case law on this, but, basically, under the law as I understand it, the [c]ourt isn't going to take any further action at this time."

¶ 18 On September 18, 2013, the trial court, noting defendant's numerous prior felonies as well as a lack of factors in mitigation, sentenced defendant to concurrent prison terms of (1) 28 years for the armed robbery conviction, (2) 5 years for aggravated battery, (3) and 5 years for theft. Thereafter, defendant filed a motion to reconsider sentence. Following a September 26,

2013, hearing, the court denied defendant's motion.

¶ 19     This appeal followed.

¶ 20                                    II. ANALYSIS

¶ 21     On appeal, defendant argues the trial court erred in failing to find a *per se* conflict of interest on the part of his trial counsel where counsel contemporaneously represented both defendant and Graves. Specifically, defendant contends the conflict arose when Graves testified against him as a witness for the State.

¶ 22     The State, on the other hand, argues Graves was not a prosecution witness because she was declared hostile and all of her testimony benefitted defendant. In the alternative, the State maintains even if a *per se* conflict existed, the waiver defendant signed was sufficient to overcome it.

¶ 23     For the reasons that follow, we find defendant's trial counsel suffered from a *per se* conflict of interest due to the dual representation and the purported waiver was insufficient to overcome that conflict.

¶ 24                              A. Conflict of Interest

¶ 25     "The sixth and fourteenth amendments to the United States Constitution guarantee the right to effective assistance of counsel." *People v. Taylor*, 237 Ill. 2d 356, 374, 930 N.E.2d 959, 970 (2010). "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *Taylor*, 237 Ill. 2d at 374, 930 N.E.2d at 970. There are two types of conflicts: *per se* and actual. *People v. Fields*, 2012 IL 112438, ¶ 17, 980 N.E.2d 35. We note defendant does not argue an actual conflict of interest existed. Whether a conflict of interest exists must be evaluated on the specific facts of each case. See

*People v. Johnson*, 227 Ill. App. 3d 800, 811, 592 N.E.2d 345, 353 (1992). Where, as here, the facts are undisputed, we review the issue of whether a *per se* conflict exists *de novo*. *Fields*, 2012 IL 112438, ¶ 19, 980 N.E.2d 35.

¶ 26 A *per se* conflict of interest exists where "certain facts about a defense attorney's status were held to engender, by themselves, a disabling conflict." (Emphasis omitted.) *People v. Spreitzer*, 123 Ill. 2d 1, 14, 525 N.E.2d 30, 34 (1988). When a *per se* conflict of interest is shown, a defendant is not required to show prejudice resulting from the conflict in order to obtain relief. *Spreitzer*, 123 Ill. 2d at 15, 525 N.E.2d at 35 (citing *People v. Stoval*, 40 Ill. 2d 109, 113, 239 N.E.2d 441, 444 (1968)). The *per se* conflict rule " 'is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties.' " *People v. Lawson*, 163 Ill. 2d 187, 210, 644 N.E.2d 1172, 1183 (1994) (quoting *People v. Gerold*, 265 Ill. 448, 477, 107 N.E. 165, 177 (1914)).

¶ 27 The supreme court has identified three situations where a *per se* conflict exists: "(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved with the prosecution of defendant." *Fields*, 2012 IL 112438, ¶ 18, 980 N.E.2d 35. The determinative question in this case involves the second enumerated scenario, *i.e.*, whether defendant's trial counsel contemporaneously represented defendant and a prosecution witness. It is undisputed defendant's counsel represented both defendant and Graves at the same time and that Graves was called by the State to testify at defendant's trial. We note

the parties stated at oral argument the State had listed Graves as a witness for the State.

¶ 28    While the State now contends Graves was not a prosecution witness because she was declared hostile and all of her testimony benefitted defendant, it is clear the State used Grave's testimony to introduce her prior inconsistent statements, made during her police interviews, as substantive evidence.  See *People v. Thomas*, 131 Ill. 2d 104, 112, 545 N.E.2d 654, 657 (1989) (finding the witness was a prosecution witness in a *per se* conflict analysis where the State extracted responses of " 'I don't remember' " in a way so as to highlight her previous statements to police under the guise of impeachment).

¶ 29    Although Graves recanted her prior statements during her testimony, once she admitted she made them, it became a matter of credibility for the jury as to which version of events to believe.  More important, through her testimony, the State was able to place defendant with the other two suspects, one of whom admitted to the crime, just after the robbery.  Those statements, if believed over her live testimony, provided the link necessary to conclude defendant was one of the three individuals involved in the armed robbery.  Viewing Graves' testimony in this light defeats any argument it was strictly beneficial to defendant.  Thus, it would be improper to characterize Graves as a defense witness.  As a result, we find a *per se* conflict of interest existed.

¶ 30    We note the record also demonstrates conduct which could be used in an actual conflict of interest analysis.  For example, because Graves' testimony differed from her prior statements, the State sought to introduce audio and video recordings of her police interviews into evidence.  Not only did counsel fail to object to the State's request to introduce this evidence, he actually acquiesced to that request by stipulating to their admissibility.  The audio and video

recordings were then played for the jury without objection. Written transcripts of the interviews were also handed out to the jury absent any objection. We question the admissibility of the recorded interviews where Graves admitted making the statements in the first instance, rather than denying she made them. This example alone demonstrates defendant received less than the aggressive advocacy to which he was entitled. See *Thomas*, 131 Ill. 2d at 113, 545 N.E.2d at 657. Other examples include counsel's failure to conduct any meaningful cross-examination of Graves or otherwise attempt to impeach her with a prior conviction.

¶ 31        However, because we find the circumstances present in this case resulted in a *per se* conflict, it is unnecessary for the defendant to show actual prejudice in order to be entitled to a reversal of his conviction. *Stoval*, 40 Ill. 2d at 113, 239 N.E.2d at 444.

¶ 32                                    B. Waiver

¶ 33        The State maintains even if a *per se* conflict existed, the waiver defendant signed was sufficient to overcome the conflict. We disagree.

¶ 34        If the record reveals a *per se* conflict of interest, reversal is required unless the defendant waived his right to conflict-free counsel. *Fields*, 2012 IL 112438, ¶ 18, 980 N.E.2d 35. However, a waiver of an existing conflict of interest is not valid unless the defendant is admonished regarding the existence and the significance of the conflict, *i.e.*, the waiver must be made knowingly. *People v. Olinger*, 112 Ill. 2d 324, 339, 493 N.E.2d 579, 587 (1986) (citing *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978), and *People v. Kester*, 66 Ill. 2d 162, 168, 361 N.E.2d 569, 572 (1977)). Courts should attempt to "indulge every reasonable presumption against waiver *** and *** not presume acquiescence" ((internal quotation marks omitted) *Stoval*, 40 Ill. 2d at 114, 239 N.E.2d at 444), even if counsel was retained (*People v. McClinton*,

- 11 -

59 Ill. App. 3d 168, 173, 375 N.E.2d 1342, 1346-47 (1978)). "Regardless of whether a defendant is represented by a public defender or a private practitioner, a criminal defendant has a constitutional right to the undivided loyalty of counsel, free of conflicting interests." *People v. Woidtke*, 313 Ill. App. 3d 399, 409, 729 N.E.2d 506, 513 (2000) (citing *People v. Coleman*, 301 Ill. App. 3d 290, 298-99, 703 N.E.2d 137, 143 (1998)). In determining whether there has been an intelligent waiver of the defendant's right to conflict-free counsel, the circumstances surrounding the claimed waiver must be considered. *People v. Washington*, 101 Ill. 2d 104, 114, 461 N.E.2d 393, 398 (1984).

¶ 35        In this case, defendant was purportedly waiving his sixth amendment right to conflict-free counsel. However, it is undisputed the trial court was not informed of the conflict and no waiver was filed or discussed with the court prior to or during defendant's trial. It was not until after defendant was convicted that the court, on its own motion, delved into the matter. Because the issue came to the attention of the court after his conviction, defendant never had the opportunity to be admonished by the court as to the *potential* consequences of the dual representation. See *Thomas*, 131 Ill. 2d at 111, 545 N.E.2d at 656 (when a potential *per se* conflict arises "the court must ascertain the extent of the risk and take whatever measures are necessary to protect the accused's guarantee of effective assistance of counsel"). Instead, counsel knew of dual representation prior to trial, took it upon himself to determine whether a conflict existed, and then sought to secure defendant's waiver on his own when he thought a conflict might be present. At best, this was improper. See *Stoval*, 40 Ill. 2d at 114, 239 N.E.2d at 444 ("The difficulty in appropriately advising an accused of this right almost directs that counsel *** be free from any such conflict.").

¶ 36     For all the State makes of the waiver, it admitted in its brief and again during oral argument there is no way of knowing what counsel told defendant at the time the waiver was signed. Thus, it cannot be said, on this record, the defendant was adequately informed of the significance of the conflict. See *Stoval*, 40 Ill. 2d at 114, 239 N.E.2d at 444 ("It cannot be said, judging by this record, that the defendant was adequately informed of the significance of conflict of interests *** and that he understood how a conflict could affect, sometimes subtly, a client's representation."). Indeed, the record does not reveal whether defendant was advised of the conflict in a way he might understand how it could affect his representation. See *McClinton*, 59 Ill. App. 3d at 173, 375 N.E.2d at 1347 (for a waiver to be valid the record must show the "defendant was adequately advised of the significance of his attorney's conflict of interest and that he understood how a conflict could affect the attorney's ability to represent him" (citing *Stoval*, 40 Ill. 2d at 114, 239 N.E.2d at 444)). In the words of our supreme court:

"We caution attorneys in the future and remind them of their obligation to bring to the trial court's attention any facts or circumstances that may create a conflict of interest. Bringing the situation to the trial court's attention would have provided the court with an opportunity to explain the circumstances and ramifications to defendant. Defendant could have made an informed decision about the situation and the conflict could have been waived had defendant so desired. Defendant was not afforded this opportunity in the case at bar because the attorneys never advised defendant or the trial court of the facts." *People v. Hernandez*, 231 Ill. 2d 134, 152, 896 N.E.2d

- 13 -

297, 308-09 (2008).

¶ 37      In sum, we are left with no choice but to reverse defendant's conviction and remand for a new trial. See *People v. Daly*, 341 Ill. App. 3d 372, 378-79, 792 N.E.2d 446, 452 (2003). In so concluding, we find no double jeopardy bar to retrial where the evidence presented against defendant was such that a rational trier of fact could have concluded he was proved guilty beyond a reasonable doubt. *People v. Ward*, 2011 IL 108690, ¶ 50, 952 N.E.2d 601. However, we note our determination regarding the evidence is not binding on retrial, and does not express our opinion as to defendant's ultimate guilt or innocence. *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 21, 975 N.E.2d 258.

¶ 38                                III. CONCLUSION

¶ 39      For the reasons stated, we reverse defendant's conviction and remand for a new trial. Because we conclude the evidence was sufficient to convict defendant, no double jeopardy impediment to retrial is present.

¶ 40      Reversed and remanded with directions.