NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 200011-U

NO. 4-20-0011

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 17, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| KWANTREVIS D. RICHARDSON, | ) | No. 17CF1643 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court reversed and remanded, concluding defendant did not
knowingly waive defense counsel's *per se* conflict of interest.

¶ 2        In November 2019, defendant was convicted after a jury trial of two counts of

first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2016)). The trial court sentenced defendant

to a term of natural life imprisonment without the possibility of parole.

¶ 3        On appeal, defendant contends he did not knowingly and intelligently waive trial

counsel's *per se* conflict of interest. We reverse and remand.

¶ 4                                I. BACKGROUND

¶ 5        In November 2017, the State charged defendant by information with six counts of

first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2016)) (counts I-VI), two counts of murder

while committing a forcible felony, home invasion (720 ILCS 5/9-1(a)(3) (West 2016)) (counts VII and VIII), and one count of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2016)) (count IX), related to the deaths of Jonathan Ballance and Michael Roberts. The Macon County public defender was appointed to represent defendant. In September 2018, private counsel, Christopher L. Amero, entered his appearance as defense counsel.

¶ 6                                  A. Conflict Waiver

¶ 7          At a hearing on October 10, 2019, Amero informed the trial court he represented defendant and a witness for the prosecution, Mark Connelley. Amero stated he had discussed the conflict with the State and with defendant, and defendant had "no issue with [his] dual representation."

¶ 8          At an October 16, 2019, hearing, defendant appeared before the trial court. Amero informed the court he represented Connelley in unrelated criminal matters, and the State intended to call Connelley as a witness at defendant's trial. Amero explained he spoke with defendant and stated defendant had "no problem with [his] dual representation." Amero asked the court "to admonish [defendant] and then get it on the record." The following colloquy occurred:

> "THE COURT: Okay. There is Mr. Connelley who is supposed to testify in your case. Your attorney, Mr. Amero, does represent him currently; and what we're here today is to determine whether or not you are willing to waive your right to any conflict with Mr. Amero representing a potential witness. First of all, have you had ample time to speak with Mr. Amero about this matter?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: And do you have any issues with Mr. Amero representing you and also the potential witness?

- 2 -

THE DEFENDANT: No, not at all.

THE COURT: Okay. And as you've stated, you have had ample time to talk with Mr. Amero about this issue?

THE DEFENDANT: Yes, sir.

THE COURT: And you are willing to waive any potential conflict in this matter; is that correct?

THE DEFENDANT: Is that right?

MR. AMERO: That's just saying you don't have any issue.

THE DEFENDANT: Oh, yeah. Yes, sir.

THE COURT: So you do not have any issue, and you are willing to waive any conflict; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: You understand if you waive a conflict at this time, you can't wait until after the trial and raise that issue again? You understand that?

THE DEFENDANT: Yes.

THE COURT: Then, Ms. Kroncke [(State's Attorney)], anything further as far as admonishing him?

MS. KRONCKE: I'd just like to put on the record what the cases are that Mr. Amero represents [Connelley] on. It's 19-CF-1328. It's an aggravated DUI and a driving while revoked. That case is pending. And then 19-CF-899. It's a possession of a controlled substance, driving while revoked, and obstructing identification. And all those cases are still pending.

THE COURT: And we have put that on the record at this stage as to the cases that Mr. Amero does represent him on. And as far as Mr. Connelley's testimony, is that something that—

***

MS. KRONKE: Mr. Connelley's testimony would be that defendant appeared in a vehicle that we believe will be shown to be the vehicle that fled the murder scene and that the defendant made a statement that he needed to get out of town. And shortly thereafter, the police came to arrest the defendant. So Mr. Connelley was present when the defendant was arrested. His testimony should only be about five minutes.

THE DEFENDANT: You didn't tell me that."

At this point, defendant and Amero had a conversation off the record. Amero informed the court "Well, it appears now [defendant] may have some sort of an issue." Defendant interjected, "Yeah, I've changed my mind." The court allowed time for Amero to speak with the state's attorney and defendant. After a brief recess, the following colloquy occurred:

"MR. AMERO: Your Honor, I spoke with Ms. Kroncke and [defendant]. I think [defendant] was confused about the language Ms. Kroncke used with regard to Mr. Connelley's testimony. I did explain to him what his testimony would be, and I indicated to him that—what the waiver entails on him waiving any sort of conflict. He indicated to me that he has no issue with me representing Mr. Connelley in those unrelated matters.

THE COURT: Okay. [Defendant], we've kind of went through this already; but I'm going to go through it a little deeper. First of all, according to

- 4 -

your attorney, he's had an opportunity to discuss a little further with you at this time as to what the testimony would be along with what the conflict or potential conflict is. Do you feel you've had adequate time to speak with Mr. Amero at this stage?

THE DEFENDANT: Yes, sir.

THE COURT: And are you willing to waive any potential conflict in this matter as to Mr. Connelley?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand at least what it is proposed the evidence will be as to Mr. Connelley?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand at this stage that Mr. Amero does represent Mr. Connelley on an unrelated matter?

THE DEFENDANT: Yes, sir.

THE COURT: So are you willing to waive any potential conflict in this matter?

THE DEFENDANT: Yes, sir.

THE COURT: Then, Ms. Kroncke, anything you think we need to go further on this matter?

MS. KRONCKE: No, Your Honor.

THE COURT: Mr. Amero, anything further?

MR. AMERO: No. Thank you.

THE COURT: So I am going to show the defendant does waive any conflict as it related to Mr. Amero representing Mr. Connelley on an unrelated matter."

¶ 9                                       B. Defendant's Trial

¶ 10        On October 22, 2019, the State proceeded to trial on counts I through VI. Counts VII and VIII were dismissed and count IX was severed.

¶ 11                                       1. *State's Witnesses*

¶ 12                                       a. Jason Danner

¶ 13        Decatur police officer Jason Danner testified on October 31, 2017, he responded to a call reporting five or six gunshots fired. Danner arrived at the scene and saw a white Chevrolet Malibu Max parked on the street. The vehicle appeared to be unoccupied. While speaking to the witnesses who reported the gunshots, Danner heard "what sounded like an engine start to roar, tires squealing." The Malibu proceeded south and was pursued by other officers. Danner approached the residence at 3129 North Kent Avenue where the Malibu had been parked. As he approached, he noticed a flip cell phone on the sidewalk leading up to the mobile home. The door appeared to have been kicked in. Officer Danner entered the residence for a protective sweep and observed two deceased men in the living room. The victims, identified as Michael Roberts and Jonathan Ballance, had multiple gunshot wounds.

¶ 14                                       b. Josh Yaeger

¶ 15        Former Decatur police officer Josh Yaeger testified he responded to the report of shots fired with Officer Brandon Rolfs in separate vehicles. As they approached the scene, Yaeger observed the parked Malibu. He stated the front door was ajar but the windows were tinted and he did not see anyone inside the vehicle. The door of the Malibu closed, and the

vehicle "took off," travelling at a "very high rate of speed." Yaeger pursued the Malibu assisted by Rolfs, but the officers decided to terminate the pursuit in accordance with department policy.

¶ 16                                        c. Brandon Rolfs

¶ 17          Officer Brandon Rolfs of the Decatur Police Department testified, when he arrived on the scene, he observed the front, driver's side door of the Malibu was open and no one was in the driver's seat. Rolfs stayed in his marked patrol car. He observed a black male, who he described as between five feet eight inches and six feet tall, medium build, and had hair short or pulled tight. Rolfs watched the man leave the front porch of the mobile home at 3129 North Kent, get into the Malibu, and drive off. Rolfs and Yaeger pursued the vehicle. Rolfs decided to terminate the pursuit in accordance with department policy and returned to the scene. He entered the mobile home and observed the two deceased victims.

¶ 18                                        d. Matthew Bledsaw

¶ 19          Matthew Bledsaw testified on October 31, 2017, he and his then wife were returning home from trick-or-treating. Bledsaw knew his neighbor, Michael Roberts, as "Mike." He noticed a white Chevrolet Malibu Max in front of Roberts's residence he did not recognize. Bledsaw went inside and watched television for awhile when he heard three or four gunshots. He recognized the shots as coming from a weapon that was "smaller caliber, nine millimeter." Bledsaw saw a woman run out of Roberts's house followed by a black male. The man yelled, "Shantell." (We note defendant later stipulated to this testimony after an initial objection.) The woman ran "[f]ast as she could" until she was out of sight. According to Bledsaw, the woman "looked terrified." The man reentered the trailer. While Bledsaw was speaking to police officers about the gunshots, he observed a man exit Roberts's trailer, get into the Malibu, and "drive off at a very high rate of speed."

¶ 20                                    e. Dawn Workman

¶ 21          Dawn Workman, formerly Bledsaw, testified she and her then husband arrived home and noticed a vehicle in front of Roberts's home she did not recognize. The vehicle was either silver or white, and the headlights were on. They went inside and watched television, but she occasionally glanced out the window because she thought the car was "strange." She heard four or five gunshots and called the police. She looked out the window and saw a woman "take off" from Roberts's trailer. While on the phone with the police, she heard one or two more gunshots. She walked outside when police officers arrived and saw the vehicle drive off. She stated the police responded to her call "pretty quickly," arriving after "[m]aybe two minutes."

¶ 22                                    f. Chris Snyder

¶ 23          Decatur police officer Chris Snyder testified he was a K-9 handler. He conducted an article search along the flight path of the vehicle. Along the flight path, Snyder's canine alerted to approximately six empty bullet casings, a black metal pistol magazine, and a black semi-automatic pistol.

¶ 24                                    g. Erik Ethell

¶ 25          Sergeant Erik Ethell testified he conducted a crime scene investigation. He collected the items located by Officer Snyder's canine. The eight-round magazine was empty. The firearm was a "Hi-Point nine millimeter handgun" and had a malfunction referred to as a "stove pipe," wherein the slide fails to completely extract a round and the round jams in the gun. There was blood on the firearm. Ethell also examined the scene inside the trailer, locating multiple spent shell casings, spent projectiles, and damage from projectiles. A crowbar was lying next to Roberts, and Ballance had a cigarette lighter in his right hand.

¶ 26                                    h. Scott Cline

¶ 27          Detective Scott Cline testified he assisted Sergeant Ethell with evidence collection. Cline returned to the scene a week after the shootings. The residence had been cleaned and two bullets were visible in the floor under where Ballance's body had been. An additional bullet had been placed on the windowsill by cleaners.

¶ 28                              i. Nykia Shantrell Ewing

¶ 29          Nykia Shantrell Ewing testified, on October 31, 2017, she was dating defendant. She lived at 1387 West Wellington Way, Apartment C, and defendant lived with her "some times." Defendant was the only person who called her by her middle name, Shantrell. The afternoon of the shootings, defendant and Ewing were at her father's house. Defendant and Ewing left the house together in defendant's car, a white Malibu. They got in an argument during the drive because defendant thought Ewing was cheating on him. Defendant acted "[v]ery, very aggressive" and they continued to argue once they returned to the apartment, resulting in a breakup. Defendant left the apartment and said he would come back for his belongings.

¶ 30          After Ewing went to bed, defendant called her several times. Ewing was using a cell phone defendant loaned her, as her usual cell phone was broken. When Ewing finally answered the phone, defendant told her he wanted her to "ride with him somewhere." Defendant told Ewing to bring some of the bullets he kept in her apartment. Defendant picked up Ewing, but Ewing did not bring the bullets with her. Defendant drove her to a mobile home park where defendant had brought her before. Defendant told Ewing to hand him a black gun from the passenger side floorboards. Ewing noticed the gun had "some stuff on it, like, blood or something on it." Defendant loaded the gun with three or four bullets. Ewing testified she started to panic. Defendant forced Ewing out of the car, and she followed him up the sidewalk to the door of the mobile home. Through the open door, she saw a man sitting in a chair "gasping for

air." The man was covered in blood. Ewing saw defendant point his gun at the man, and she turned and ran from the scene. As she ran, she heard a "lot of gunshots." Ewing got a ride from a man she did not know to a nearby IHOP restaurant to wait for her father to pick her up. She saw police pursuing defendant's car while she waited.

¶ 31    Ewing went to the police station the following morning and participated in an interview. Defendant called Ewing while she was being interviewed, and Ewing agreed to let the police record her conversations with him. Ewing also consented to a search of her apartment.

¶ 32                    j. Apartment Search

¶ 33    Officer Bryan Kaylor testified he participated in the search of Ewing's apartment. During the search, Kaylor located a purse containing an iPhone and documents containing defendant's name, including a wallet with defendant's social security card and birth certificate.

¶ 34    Detective Brad Hall testified he assisted with the search of Ewing's apartment. He located a box of ammunition and mail addressed to defendant.

¶ 35                    k. Defendant's Arrest

¶ 36    Detective James Callaway testified he was assigned to locate defendant. Callaway located defendant, where he was seated in a "white Chevy Malibu." The Malibu was in a driveway with the hood up, and a man outside the vehicle appeared to be doing mechanical work. Defendant was taken into custody and the Malibu was towed to the Decatur Police Department.

¶ 37    Detective Scott Marquis testified he assisted with taking defendant into custody. Defendant complied with orders from officers. During his arrest, defendant dropped a cell phone on the ground, which was seized.

¶ 38                    l. Mark Connelley

¶ 39            Mark Connelley testified he had known defendant for "[p]robably ten years." On November 1, 2017, Connelley washed defendant's car, and defendant left. A few hours later, defendant returned and asked Connelley to look at his radiator, which Connelley started to fix. Defendant told Connelley he was "trying to get on the highway" or get out of town. While Connelley was working on defendant's car, police "swarmed in" and arrested defendant. The State impeached Connelley with his convictions for driving while his license was revoked. On cross-examination, Connelley agreed he never asked defendant why he was trying to leave town and he had repaired defendant's car before. Defense counsel did not question Connelley about his prior convictions or pending charges.

¶ 40                              m. Jason Debort

¶ 41            Detective Jason Debort testified he was the lead detective for the deaths of Roberts and Ballance. Debort participated in interviewing Ewing the day after the shootings. He collected DNA samples from Ewing, and later from defendant. Debort reviewed extraction reports from defendant's multiple cell phones. One report revealed 13 calls between defendant and Ewing the night of the shooting and the following day. The report also showed defendant conducted several internet searches for "Decatur Halloween double homicide" and "Decatur double homicide" while Ewing was being interviewed. A second report from another phone showed a contact entry for Roberts's cell phone number.

¶ 42                              n. Forensic Testing

¶ 43            Carolyn Kersting, a forensic scientist with the Illinois State Police specializing in firearms and tool mark identification, testified without objection as an expert in firearms identification. Comparisons of test bullets fired from the recovered firearm to bullets recovered

from the scene were "inconclusive." However, Kersting testified that each of the fired bullets had rifling characteristics that were similar to the recovered firearm.

¶ 44        Kathryn Doolin, a forensic scientist with the Illinois State Police specializing in firearms identification, testified without objection as an expert in firearms identification. Doolin testified the bullets recovered from the scene were all "nine millimeter, .38 class bullets with three left rifling," but were "inconclusive or could not be identified or eliminated as being fired by [the recovered firearm]." Based on her own test-fire of the firearm in question, Doolin concluded the shell casings recovered were fired by the recovered firearm.

¶ 45        Dr. Scott Denton testified he is a forensic pathologist and conducted the autopsies on the victims. In his autopsy of Roberts, Dr. Denton located a bullet in the hood of Roberts's jacket. Roberts had multiple blunt force injuries consistent with strikes from a heavy, blunt, metal object. Dr. Denton also observed abrasions on Roberts's neck consistent with someone grabbing his neck. Roberts had 13 separate gunshot wounds, some with evidence of close-range firing. Gunshot wounds to Roberts's chest would have made it difficult for him to breathe. Dr. Denton classified some of the gunshot wounds as defensive wounds, "where a person will instinctively hold up their arms or hands if they see something that is dangerous to them." Roberts's toxicology report showed he had used large amounts of cocaine and a benzodiazepine (Xanax) before his death.

¶ 46        In his autopsy of Ballance, Dr. Denton observed six gunshot wounds. Some of Ballance's wounds also showed evidence of close-range firing. The gunshot wounds to Ballance's legs indicated he was in the fetal position. Dr. Denton noted superficial injuries to Ballance unrelated to the gunshots. Dr. Denton recovered two bullets from Ballance's body. Ballance's toxicology report showed he had cocaine in his system. Dr. Denton testified the

gunshot wounds on Roberts and Ballance all appeared to be from a medium caliber firearm, such as a nine-millimeter.

¶ 47                                    o. Timothy Wittmer

¶ 48            Detective Timothy Wittmer of the Decatur Police Department testified he interviewed defendant after his arrest. Defendant initially denied any involvement in the homicides. Defendant then told Officer Wittmer he arrived at the scene to see an additional suspect leaving who defendant believed was responsible. Defendant finally asserted self-defense. The State played the recording of defendant's interview for the jury

¶ 49                                    2. *Stipulations*

¶ 50            The parties entered several stipulations as to testimony of forensic scientists from the Illinois State Police Crime Lab. No fingerprints were found suitable for comparison on the firearm or magazine. The firearm, magazine, and crowbar were swabbed for DNA evidence. A major male profile matching Roberts was identified on the firearm, from the blood on the firearm, on the magazine, and on the crowbar. A minor profile identified excluded defendant, Ewing, Roberts, and Ballance. Defendant, Ewing, and Ballance were excluded from a male profile identified.

¶ 51                                    3. *Defense and Closing Arguments*

¶ 52            Defendant did not present any evidence.

¶ 53            During closing arguments, among other things, the State argued, "When the defendant was apprehended on the 1st, he was trying to get his car fixed so he could get on the highway. That is what he told Mr. Connelley."

¶ 54                                    4. *Verdict and Sentencing*

¶ 55        After deliberation, the jury found defendant guilty of first degree murder in the deaths of Roberts and Ballance, and determined as to both counts "the defendant personally discharged a firearm that proximately caused the death to another person."

¶ 56        On November 22, 2019, defendant filed a "motion for a new trial or, in the alternative, for a judgment notwithstanding the verdict." Defendant argued (1) the State failed to prove him guilty beyond a reasonable doubt and (2) the evidence was insufficient to sustain first degree murder convictions.

¶ 57        At a hearing on December 9, 2019, the trial court denied defendant's motion for a new trial. The court sentenced defendant to a mandatory natural life sentence without the possibility of parole.

¶ 58        This appeal followed.

¶ 59                                II. ANALYSIS

¶ 60        Defendant argues this court should reverse his conviction for first degree murder and remand for a new trial because defendant did not knowingly waive a *per se* conflict of interest. We agree.

¶ 61                          A. *Per Se* Conflict of Interest

¶ 62        "[A] criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Fields*, 2012 IL 112438, ¶ 17, 980 N.E.2d 35. There are two types of conflict of interest: *per se* and actual. *Fields*, 2012 IL 112438, ¶ 17. A *per se* conflict exists "[w]hen a defendant's attorney has a tie to a person or entity that would benefit from an unfavorable verdict for the defendant." *People v. Hernandez*, 231 Ill. 2d 134, 142, 896 N.E.2d 297, 303 (2008). This danger exists, as recently clarified by our supreme court, "(1) when defense counsel has a contemporaneous association with the victim, the

- 14 -

prosecution, or an entity assisting the prosecution; (2) when defense counsel contemporaneously represents a prosecution witness; and (3) when defense counsel was a former prosecutor who was personally involved in the prosecution of the defendant." *People v. Yost*, 2021 IL 126187, ¶ 66.

¶ 63        In this case, defense counsel represented a prosecution witness, Connelley, in unrelated criminal matters. It is undisputed defense counsel's contemporaneous representation of defendant and Connelley constituted a *per se* conflict of interest. Where a *per se* conflict exists, "a defendant need not show that the conflict affected the attorney's actual performance," and unless the defendant waives the conflict, it is automatic grounds for reversal. *Fields*, 2012 IL 112438, ¶ 18.

¶ 64        Here, the trial court accepted defendant's waiver of conflict after a hearing. On appeal, the question is whether defendant's waiver of conflict is valid. A waiver of a conflict of interest is not valid and made knowingly unless "the defendant is admonished regarding the existence and the significance of the conflict." *People v. Poole*, 2015 IL App (4th) 130847, ¶ 34, 39 N.E.3d 1086. "A defendant must actually understand how the conflict could affect his attorney's representation, before his right to a conflict-free attorney can be knowingly waived." *People v. Coleman*, 301 Ill. App. 3d 290, 301, 703 N.E.2d 137, 145 (1998). "Regardless of whether a defendant is represented by a public defender or a private practitioner, a criminal defendant has a constitutional right to the undivided loyalty of counsel, free of conflicting interests." *People v. Woidtke*, 313 Ill. App. 3d 399, 409, 729 N.E.2d 506, 513 (2000) (citing *Coleman*, 301 Ill. App. 3d at 298-99). Courts of review are to err on the side of caution, looking at every reasonable presumption against waiver of constitutional rights and not presume acquiescence. See *People v. Stoval*, 40 Ill. 2d 109, 114, 239 N.E.2d 441, 444 (1968); see also

*Poole*, 2015 IL App (4th) 130847, ¶ 34. "In determining whether there has been an intelligent waiver of the defendant's right to conflict-free counsel, the circumstances surrounding the claimed waiver must be considered." *Poole*, 2015 IL App (4th) 130847, ¶ 34.

¶ 65                                B. Standard of Review

¶ 66        Defendant contends we should review this question *de novo*. See *Hernandez*, 231 Ill. 2d at 144 ("[T]he question of whether a *per se* conflict exists is a legal question we review *de novo*."). However, *Hernandez* is inapposite, as here, there is no question that a *per se* conflict exists. The State argues we should instead review the trial court's acceptance of defendant's waiver for an abuse of discretion. See *People v. Holmes*, 141 Ill. 2d 204, 224, 565 N.E.2d 950, 958 (1990) ("[W]here the trial court must exercise discretion, a court of review will not find error or set aside a ruling of a trial judge unless there has been a clear abuse of discretion."). *Holmes* is also inapposite to the case at bar, as the question before the court was whether the trial court erred by *not* allowing waiver and therefore impacted defendant's right to counsel of choice. *Holmes*, 141 Ill. 2d at 220. We need not resolve this issue at this juncture as our conclusion remains the same under either standard.

¶ 67                                C. Waiver of Conflict

¶ 68        In *People v. Acevedo*, 2018 IL App (2d) 160562, 121 N.E.3d 530, the Second District reviewed whether the defendant's waiver of a conflict of interest was knowing. In that case, it stated the waiver was not made knowingly because the record did not reveal the defendant was informed about the possible ramifications of the conflict or knew about the possible impact on his counsel's ability to zealously advocate of his behalf. *Acevedo*, 2018 IL App (2d) 160562, ¶ 20. The conflict was brought to the trial court's attention and discussed with the defendant. The defendant's counsel represented a State's witness who had another case

- 16 -

pending with the defendant as a codefendant as well. The State informed the court what they expected the witness to say, and the court received assurances from counsel he discussed with the defendant, "the conflict, the ramifications of that, what we expect to happen [if the witness creating the conflict] is called as a witness and how it affects [the defendant] and his rights." (Internal quotation marks omitted.) *Acevedo*, 2019 IL App (2d) 160562, ¶ 19. The court informed the defendant about possible issues which may arise during the trial and asked if he had discussed these with counsel, which he acknowledged.

¶ 69    While agreeing the defendant was aware of the *existence* of the conflict, the Second District found the record failed to adequately reflect the defendant was advised of the *significance* of the conflict. It noted the record revealed none of the specific discussions between the counsel and the defendant. There was no indication counsel told the trial court what information he gave the defendant about the possible effects of the conflict on his representation, nor did the defendant say whether he knew how that might affect counsel's zealous representation of him. *Acevedo*, 2018 IL App (2d) 160562, ¶ 20. The court in *Acevedo* acknowledged the trial court informed the defendant the conflict was "serious," and that there were issues which might arise, but pointed out it was "never explained to defendant, in a way he might understand, how the conflict could impact counsel's representation of him," citing this court's decision in *Poole*. *Acevedo*, 2018 IL App (2d) 160562, ¶ 20.

¶ 70    In this case, defendant received even less admonishment from the trial court than the defendant in *Acevedo*. Whereas the trial court in *Acevedo* discussed with counsel in the most general terms the contents of his discussion with the defendant, here, the court merely asked defendant if he had "adequate time" to speak with Amero. Nowhere in the record did Amero explain to the court the specifics of their discussions, and the court did not inquire about the

specifics of those discussions. There were no discussions on the record as to the various issues which may arise because of the conflict or the effect on Amero's representation. The court merely asked of defendant if he had any issues with Amero's representation of Connelley without assuring defendant understood what issues he *could* have with the conflict.

¶ 71 The State argues defendant's prior record of involvement with the court system provided him with the requisite knowledge of the potential issues. We disagree. Regardless of defendant's prior criminal history—which, as defendant notes, involved two guilty pleas and no trials—the *Acevedo* court noted we said in *Poole* the waiver was invalid, in part, because " 'the record does not reveal whether defendant was advised of the conflict in a way he might understand how it could affect his representation.' " *Acevedo*, 2018 IL App (2d) 160562, ¶ 20 (quoting *Poole*, 2015 IL App (4th) 130847, ¶ 36). As we conclude there is nothing *in the record* from which we can conclude defendant understood the potential issues that may arise from a conflict of interest, defendant cannot have knowingly and intelligently waived the conflict of interest, and we reverse his convictions for first degree murder.

¶ 72 We do not reverse defendant's convictions lightly. However, where a *per se* conflict of interest exists and defendant did not knowingly and intelligently waive the conflict, "defendant's conviction *must* be reversed." *People v. Graham*, 206 Ill. 2d 465, 472, 795 N.E.2d 231, 236 (2003). Our supreme court has previously discussed the importance of this policy:

> "There is no showing that the attorney did not conduct the defense of the accused with diligence and resoluteness, but we believe that sound policy disfavors the representation of an accused *** by an attorney with possible conflict of interests. It is unfair to the accused, for who can determine whether his representation was affected, at least, subliminally, by the conflict. Too, it places an additional burden

- 18 -

on counsel, however conscientious, and exposes him unnecessarily to later charges that his representation was not completely faithful." *Stoval*, 40 Ill. 2d at 113.

Though we may now see the trial with the benefit from hindsight, a defendant waiving their counsel's conflict of interest does not do so with the benefit of foresight. Therefore, it is the duty of the trial court to assure their decision is as informed as possible.

¶ 73 Though there are no talismanic admonishments trial courts are required to give, courts must assure the defendant has an adequate understanding of the possible ways a conflict of interest may affect counsel's vigorous representation. This may require the court to speculate about the possible problems which might arise due to a conflict to determine if a defendant is properly informed. Because defendant and the trial court do not benefit from hindsight during this process, we too contemplate those issues that could have arisen due to Amero's conflict of interest: there was no discussion with defendant about how Amero may not vigorously cross-examine Connelley, or that he might refrain from seeking to impeach Connelley based on his pending cases to show Connelley's motivation to testify. As we see from the record, counsel did not question Connelley about his pending charges or any expressed or anticipated favor he hoped to receive from the State on his own charges. Although arguable that Connelley's testimony was not the most damaging of all witnesses, he presented as an unbiased third party, whose testimony was highlighted by the State in its closing argument. Knowing that, the pendency of criminal charges would normally be a subject for cross examining a State's witness, even without an agreement, in order to show the witness hoped to receive a benefit from his testimony. Further, counsel for a State's witness facing his own charges would be expected to seek some benefit in return for his testimony. Here, the dilemma created by counsel's continued

- 19 -

representation of both may have prevented either from receiving the full benefit of his representation. For our purposes, however, the effect on defendant's representation is paramount. There was no discussion on the record about whether Amero had negotiated with the State with regard to Connelley's pending charges. Neither the State nor defense counsel asked him when on the stand. There was no indication this possibility had ever been disclosed to defendant. More importantly, to eliminate any question, it was equally important the record reflect the absence of such negotiations, if none occurred. The facts known to all parties included a *per se* conflict of interest and dual representation of defendant and a State's witness, who also had pending criminal charges. The record contains no discussion about the possible effects of these issues on counsel's representation of defendant, or a disclosure of those possible effects, to defendant himself—all of which could have been raised by defense counsel, the State, or the trial court. We do not ask the trial courts to contemplate every possible effect of a *per se* conflict. Rather, the courts must assure a defendant understands enough of the scope and possible impact of the issues to *actually* understand how serious waiving such a conflict is. We acknowledge this is not a simple task for the trial courts. Perhaps that is the point of the supreme court when it said "[t]he difficulty of appropriately advising an accused of this right [to conflict-free counsel] almost directs that counsel, especially one appointed, be free from any such conflict." *Stoval*, 40 Ill. 2d at 114. That a defendant chose their counsel does not make the intrusion of a conflict of interest any less serious.

¶ 74                                        D. Sufficiency of the Evidence

¶ 75            We next turn to whether the evidence was sufficient to remand for a new trial. See *People v. Lopez*, 229 Ill. 2d 322, 367, 892 N.E.2d 1047, 1072-73 (2008) (holding that a retrial raises double jeopardy concerns requiring us to consider the sufficiency of the evidence). "The

- 20 -

relevant question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lopez*, 229 Ill. 2d at 367. Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of first degree murder beyond a reasonable doubt. Accordingly, we conclude that there is no double jeopardy impediment to retrial and thus remand the cause to the trial court.

¶ 76                                    III. CONCLUSION

¶ 77            For the reasons stated, we reverse defendant's convictions for first degree murder and remand for a new trial.

¶ 78            Reversed and remanded.

- 21 -